Case No. 14-3192

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

**Janna DeWitt,**

**Plaintiff-Appellant,**

**vs.**

**Southwestern Bell Telephone Company,**

**Defendant-Appellee.**

On Appeal from the United States District Court for the District of Kansas
The Honorable Sam A. Crow, U.S. District Court Judge
Case No. 2:12-cv-02605-SAC

### <u>APPELLEE'S BRIEF</u>

Michael L. Matula, No. 18138
Adam T. Pankratz, No. 22613
OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
4520 Main Street, Suite 400
Kansas City, MO  64111
(816) 471-1301
michael.matula@ogletreedeakins.com
adam.pankratz@ogletreedeakins.com

ORAL ARGUMENT IS NOT REQUESTED

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1, Southwestern Bell Telephone Company ("SWBTC") states that it is owned by AT&T Inc.  AT&T Inc. is a publicly-held company that owns 10% or more of stock of Southwestern Bell Telephone Company.

# TABLE OF CONTENTS

Corporate Disclosure Statement..........................................................i

TABLE OF AUTHORITIES ..........................................................iv

STATEMENT OF JURISDICTION....................................................1

STATEMENT OF THE ISSUES.........................................................1

STATEMENT OF THE CASE............................................................2

   A.  Statement of Facts ...............................................................4

SUMMARY OF THE ARGUMENT ..............................................15

ARGUMENT ................................................................................17

   Standard of Review................................................................17

ISSUE I NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES JUDGMENT AS A MATTER OF LAW ON DEWITT'S ADAAA DISCRIMINATION CLAIM BECAUSE DEWITT FAILED TO ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION AND/OR THAT THE REASON FOR HER TERMINATION WAS A PRETEXT FOR UNLAWFUL DISCRIMINATION ....................................................19

   A.  DeWitt Failed to Meet Her Required *Prima Facie* Burden to Show Disability Discrimination. ............................................21

       1.  DEWITT IS NOT A "QUALIFIED INDIVIDUAL WITH A DISABILITY" WITHIN THE MEANING OF THE ADAAA. .........21

       2.  SWBTC'S TERMINATION OF DEWITT'S EMPLOYMENT WAS NOT BECAUSE OF HER PURPORTED DISABILITY. .........23

   B. SWBTC Established a Legitimate Non-Discriminatory Reason for DeWitt's Termination......................................................25

   C. DeWitt cannot show pretext.................................................29

       1.  THE DISTRICT COURT PROPERLY HELD THAT THE DECISION-MAKERS ACTED REASONABLY BASED UPON INFORMATION KNOWN AT THAT TIME....................................30

       2.  KLOXIN'S ALLEGED COMMENT CANNOT CREATE AN INFERENCE OF UNLAWFUL INTENT BECAUSE SHE WAS NEITHER A DECISION-MAKER NOR INFLUENCED THE DISCHARGE DECISION. .......................................................32

3.    NOTHING ABOUT SWBTC'S INVESTIGATION INTO THE DROPPED CALLS SUGGESTS PRETEXT. ..................................... 33

D.  The District Court's Application of the "Honest Belief" Doctrine follows Tenth Circuit Law and the ADAAA. ....................................... 39

1.    THE "HONEST BELIEF" DOCTRINE IS A KEY AND INTEGRAL PART OF THE *MCDONNELL DOUGLAS* FRAMEWORK AND CONSISTENT WITH U.S. SUPREME Court and Tenth Circuit Jurisprudence ............................ 43

2.    DEWITT'S RELIANCE ON *SMITH V. CHRYSLER CORP.* IS INCONSISTENT WITH TENTH CIRCUIT LAW. ......................... 47

ISSUE II  NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES JUDGMENT AS A MATTER OF LAW ON DEWITT'S ADAAA FAILURE TO ACCOMMODATE CLAIM BECAUSE HER ONLY REQUESTED ACCOMMODATION SOUGHT RETROACTIVE LENIENCY FOR HER VIOLATION OF A WORKPLACE CONDUCT RULE .................. 49

A. Another Federal Court Recently Granted Summary Judgment Against an Employee Based on Alleged Disability-Caused Misconduct. ......................................................................... 57

ISSUE III  THE DISTRICT COURT PROPERLY GRANTED JUDGMENT AS A MATTER OF LAW ON DEWITT'S FMLA RETALIATION CLAIM .................................................... 59

CONCLUSION ................................................................................ 62

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adler v. Wal-Mart Stores, Inc.*,
   144 F.3d 664 (10th Cir. 1998) ........................................................17, 18, 41, 60

*Ainsworth v. Indep. Sch. Dist. No. 3 of Tulsa Cnty., Okla.*,
   232 F. App'x 765 (10th Cir. 2007)..............................................................25, 35

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................................17

*Anderson v. Union Pac. R. Co.*,
   529 F.Supp.2d 1270 (D.Kan. 2008)..................................................................36

*Barge v. Anheuser-Busch, Inc.*,
   87 F.3d 256 (8th Cir. 1996) ..............................................................................18

*Beaird v. Seagate Tech., Inc.*,
   145 F.3d 1159 (10th Cir. 1998) ........................................................................27

*Bullard v. Goodyear Tire & Rubber Co.*,
   09-4024-SAC, 2011 WL 4092192 (D. Kan. Sept. 14, 2011) ...........................45

*Burroughs v. City of Springfield*,
   163 F.3d 505 (8th Cir. 1998) ............................................................................24

*Bushman Constr. Co. v. Conner*,
   307 F.2d 888 (10th Cir. 1962) ..........................................................................18

*C.R. England, Inc.*, 644 F.3d at 1044...................................................................45

*Carter v. Pathfinder Energy Servs., Inc.*,
   662 F.3d 1134 (10th Cir. 2011) ........................................................................20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................17

*Cooper v. Wal-Mart Stores, Inc.*,
   2008 WL 4597226, 296 Fed.App'x 686 (10th Cir. Oct. 10, 2008)..............36, 40

*Estate of Daramola v. Coastal Mart, Inc.*,
170 Fed.App'x 536 (10th Cir. 2006) ................................................................... 35

*Dark v. Curry County*,
451 F.3d 1078 (9th Cir. 2006) ........................................................................... 26

*Davila v. Qwest Corp., Inc.*,
113 Fed.App'x. 849 (10th Cir. 2004) ................................................................. 53

*Debord v. Mercy Health Sys. of KS, Inc.*,
737 F.3d 642 (10th Cir. 2013) ........................................................................... 47

*Den Hartog v. Wasatch Academy*,
129 F.3d 1076 (10th Cir. 1997) ................................................................... *passim*

*Downes v. Beach*,
587 F.2d 469 ..................................................................................................... 18

*EEOC v. Walgreen Co.*,
34 F.Supp.3d 1049 (N.D.Cal. 2014) ........................................................... *passim*

*Fye v. Oklahoma Corp. Com'n*,
516 F.3d 1217 (10th Cir. 2008) ........................................................... 18, 32, 60

*Hester v. BIC Corp.*,
225 F.3d 178 (2d Cir. 2000) .............................................................................. 17

*Horn v. Gov't Employees Ins. Co.*,
86 Fed.App'x. 405 (10th Cir. 2004) ................................................................... 17

*Johnson v. Weld Cnty., Colo.*,
594 F.3d 1202 (10th Cir. 2010) ......................................................................... 44

*Kendrick v. Penske Transp. Servs, Inc.*,
220 F.3d 1220 (10th Cir. 2000) ......................................................................... 30

*Klaper v. Cypress Hills Cemetery*,
10-CV-1811 NGG LB, 2014 WL 1343449 (E.D.N.Y. Mar. 31,
2014) ............................................................................................................. 26, 27

*Koeughan v. Delta Airlines, Inc.*,
113 F.3d 1246, 1997 WL 290961, at *2 (10th Cir. May 27, 1997) .................... 24

*Larson v. United Air Lines*,
482 Fed.App'x. 344 (10th Cir. 2012) ....................................................17

*Lay v. Horizon/CMS Healthcare Corp.*,
60 F.Supp.2d 1234 (D.Kan. 1999)..............................................41, 47

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)...............................................................*passim*

*McMillan v. City of New York*,
711 F.3d 120 (2d Cir. 2013) ..............................................................27

*Metzler v. Federal Home Loan Bank of Topeka*,
464 F.3d 1164 (10th Cir. 2006) .........................................................26

*Miller v. Eby Realty Group LLC*,
396 F.3d 1105 (10th Cir. 2005) .........................................................45

*Mole v. Buckhorn Rubber Prods., Inc.*,
165 F.3d 1212 (8th Cir. 1999) ...........................................................22

*Morgan v. Hilti, Inc.*,
108 F.3d 1319 (10th Cir. 1997) ....................................................23, 25

*Nealy v. Water Dist. No. 1*,
554 F.Supp.2d 1226 (D. Kan. 2008)...................................................19

*Ostrowski v. Con–Way Freight, Inc.*,
543 Fed.App'x 128 (3d Cir.2013) ......................................................26

*Palish v. K & K RX Servs., L.P.*,
13-CV-4092, 2014 WL 2692489 (E.D. Pa. June 13, 2014) .........................28, 52

*Raytheon Co. v. Hernandez*,
540 U.S. 44 (2003).........................................................................54

*Reynolds v. School Dist. No. 1, Denver, Colo.*,
69 F.3d 1523 (10th Cir.1995) ...........................................................45

*Riggs v. Air Tran Airways, Inc.*,
497 F.3d 1108 (10th Cir. 2007) ...............................................29, 36, 40

*Rivera v. City & County of Denver*,
   365 F.3d 912 (10th Cir. 2004) ...........................................................40

*Salguero v. City of Clovis*,
   366 F.3d 1168 (10th Cir. 2004) .........................................................29

*Selenke v. Med. Imaging of Colo.*,
   248 F.3d 1249 (10th Cir. 2001) ....................................................25, 44

*Siefken v. The Village of Arlington Heights*,
   65 F.3d 664, 667 (7th Cir. 1995) .............................................24, 53, 59

*Smith v. Chrysler Corp.*,
   155 F.3d 799 (6th Cir. 1998) .......................................................46, 47

*Smith v. Midland Brake, Inc.*,
   180 F.3d 1154 (10th Cir. 1999) .............................................19, 20, 47

*Smothers v. Solvay Chems., Inc.*,
   740 F.3d 530 (10th Cir. 2014) ......................................................33, 38

*Stalter v. Wal-Mart Stores*,
   195 F.3d 285 (7th Cir. 1999) ..............................................................46

*Stebbins v. Reliable Heat & Air, LLC*,
   10-3305-CV-S-RED, 2011 WL 4729816 (W.D.Mo. Oct. 7, 2011)
   (aff'd, 473 F.App'x 518 (8th Cir 2012).......................................49, 50

*Swackhammer v. Sprint/United Management Co.*,
   493 F.3d 1160, 1167 (10th Cir. 2007). .............................................45

*Tele-Commc'ns, Inc. v. Comm'r*,
   104 F.3d 1229 (10th Cir. 1997) .........................................................39

*Texas Dept. of Community Affairs v. Burdine*,
   450 U.S. 248 (1981)....................................................................44, 45

*Thomas v. Wichita Coca-Cola Bottling Co.*,
   968 F.2d 1022 (10th Cir. 1992), *cert denied*, 506 U.S. 1013 (1992) ................18

*Timmerman v. U.S. Bank, N.A.*,
   483 F.3d 1106 (10th Cir. 2007) .........................................................40

*Twigg v. Hawker Beechcraft Corp.*,
  659 F.3d 987 (10th Cir. 2011) ............................................................60

*US Airways v. Barnett*,
  535 U.S. 391 (2002)...........................................................................49

*Walz v. Ameriprise Fin. Inc.*,
  22 F.Supp.3d 981, 987 ...............................................................*passim*

*Young v. Dillon Cos.*,
  468 F.3d 1243 (10th Cir. 2006) ............................................18, 20, 29

**Statutes**

42 U.S.C.S. § 12112(a), (b) ....................................................................28

**Other Authorities**

47 C.F.R. §§64.2400-64.2401.................................................................31

The Americans with Disabilities Act: Applying Performance and
  Conduct Standards to Employees with Disabilities..............................51

EEOC Guidance, "Applying Performance and Conduct Standards to
  Employees with Disabilities" § III(B)(9)(Jan. 20, 2011),
  http:www.eeoc.gov/facts/performance-conduct..................................56

*Empowering Consumers to Prevent and Detect Billing for
  Unauthorized Charges ("Cramming")*,
  Report and Order.........................................................................31, 40

Further Notice of Prosed Rulemaking, CG Docket No. 11-116, FCC
  12-42 (2012)........................................................................................31

## PRIOR OR RELATED APPEAL

No prior or related appeals.

## STATEMENT OF JURISDICTION

SWBTC concurs with DeWitt's jurisdictional statement.

## STATEMENT OF THE ISSUES

ISSUE I     NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES JUDGMENT AS A MATTER OF LAW ON DEWITT'S ADAAA DISCRIMINATION CLAIM BECAUSE DEWITT FAILED TO ESTABLISH A *PRIMA FACIE* CASE OF DISCRIMINATION AND/OR THAT THE REASON FOR HER TERMINATION WAS A PRETEXT FOR UNLAWFUL DISCRIMINATION

ISSUE II    NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES JUDGMENT AS A MATTER OF LAW ON DEWITT'S ADAAA FAILURE TO ACCOMMODATE CLAIM BECAUSE HER ONLY REQUESTED ACCOMMODATION SOUGHT RETROACTIVE LENIENCY FOR HER VIOLATION OF A WORKPLACE CONDUCT RULE

ISSUE III   THE DISTRICT COURT PROPERLY GRANTED JUDGMENT AS A MATTER OF LAW ON DEWITT'S FMLA RETALIATION CLAIM

1

## STATEMENT OF THE CASE

This is an employment case in which Plaintiff Janna DeWitt ("DeWitt") accuses Southwestern Bell Telephone Company ("SWBTC") of violating the Americans with Disabilities Act Amendments Act ("ADAAA") and Family and Medical Leave Act ("FMLA") by discharging her because of her disability (diabetes), failing to accommodate her condition, and for taking approved leaves of absence.

In reality, DeWitt—a customer service representative—was discharged because SWBTC discovered that she hung up on multiple customers, a blatant violation of a company conduct policy.  At the time of her discharge, DeWitt was on a "Last Chance Agreement" that she previously agreed to in lieu of being fired when it was discovered that she added a service to a customer account after the customer specifically declined the service – an illegal practice and SWBTC conduct policy violation – known as "cramming." A customer service representative's primary responsibility – the "essential job function" – is to keep customers happy by providing quality customer service, not hanging up on them, and not allowing unwanted services to be added to their accounts. Both violations are customer "mistreats" and are serious violations of SWBTC's Code of Business Conduct.

While DeWitt speculates about reasons for SWBTC's decision, the undisputed facts show that neither DeWitt's diabetes nor her FMLA leave were factors in the decision to terminate her. For instance:

➢ DeWitt has no "direct evidence" of discrimination or retaliation.

➢ The dropped calls came on the heels of DeWitt being on a "Last Chance Agreement" for "cramming" an unwanted service onto a customer's account. In the Last Chance Agreement, she acknowledged there was just cause to terminate her employment for "cramming" but in exchange for not doing so, DeWitt would abide by all company policies and that "even one incident" of failing to do so could lead to dismissal.

➢ DeWitt cannot identify "similarly situated" employees treated more favorably—i.e., employees already on a "last chance agreement" and later found to have engaged in a customer "mistreat."

➢ DeWitt does not deny that she hung up on the callers, claiming "she does not remember" doing so and says her low blood sugar must be the reason she did it (and cannot remember). Yet when she and her union representative were allowed to present all exculpatory evidence, no one could corroborate that she was impaired and no one (including her union representative) who viewed the video "screenshots"

3

depicting her computer screen during the calls, believed they showed any impairment.

➢ Like many employees, DeWitt had periodically taken FMLA during her employment with SWBTC.  She never had any problems getting leave requests approved.

➢ DeWitt never asked for any accommodation the hang-ups.  Prior to her hanging up on callers, DeWitt concedes she was reasonably accommodated throughout her employment regarding her diabetes.

➢ DeWitt's only proposed additional "accommodation" was an after-the-fact, post-misconduct request that work rules be more leniently applied to her than those without medical conditions who committed customer mistreats—a facially unreasonable accommodation because communicating with customers and not hanging up on them is an essential job function.

Based on these and other undisputed facts, the district court's order should be affirmed.

## A.  STATEMENT OF FACTS

When discharged, DeWitt was already on a "Last Chance" Agreement. She agreed to the Last Chance Agreement in lieu of being discharged after she left a service on a customer account that the customer has specifically declined; the

practice of adding unwanted services is known as "cramming" and constitutes a violation of SWBTC's Code of Conduct.

About four weeks after signing the Last Chance Agreement, DeWitt's immediate supervisor caught her disconnecting customer calls—another Code of Conduct violation. "Screenshot" recordings of the calls showed DeWitt making multiple, purposeful, controlled movements on her computer screen to disconnect the calls, while the audio recordings memorialized DeWitt not speaking while doing so. DeWitt had recently been coached to try and reduce her average call handling times, and intentionally dropping a couple customer calls is one way to lower average call times, giving DeWitt a motive to drop the calls despite it being prohibited. Per company practice, DeWitt was suspended.

After being suspended, and well-aware that her job was in jeopardy, DeWitt claimed that her diabetes must have been the reason she disconnected the calls. She asked for no "accommodation" other that leniency from enforcement of the Code of Conduct. DeWitt was given a "Day In Court" meeting in which she and her union representative presented their case to Kimberly Baskett-McEnany (General Manager, Consumer Call Centers). Baskett-McEnany considered the information and evidence presented including that DeWitt had been interacting with peers, had taken no action to go into auxiliary mode, and had navigated the multiple discrete steps to hang up on multiple customers. After hearing DeWitt's story, Baskett-

McEnany proceeded with discharging DeWitt, honestly believing that DeWitt had purposefully dropped the calls.

DeWitt had Type I diabetes since childhood and is insulin-dependent. Aplt.App. at 127, ¶6. SWBTC hired DeWitt in 1997 as a customer service representative. Aplt.App. at 126, ¶3. Throughout her employment, DeWitt was a member of a union, and entitled to rights under an agreement, including that a union representative could be present at any discipline meeting. Aplt.App. at 126-27, ¶4.

In 2010, Tom Heumann was DeWitt's first-line supervisor, Henry Rivera was the second-line supervisor, and Kimberly Baskett-McEnany was the third-line supervisor. Aplt.App. at 177-80. DeWitt's job responsibilities included answering calls from customers and placing residential orders. Aplt.App. at 127, ¶5; 226-27.

Customer satisfaction was an important part of DeWitt's job, and DeWitt was on the "front line" of the customer interaction to satisfy customers. Aplt.App. at 181-82. One of the, if not the, most important aspects of her position is to communicate with callers. Aplt.App. at 220. For several reasons (i.e., training and quality control), supervisors from time to time review calls. Aplt.App. at 205. One complaint DeWitt understood her supervisors had about her was that she was slow and they had coached her to reduce her call times. Aplt.App. at 200; 211. One

effect of a representative prematurely hanging up on callers is lowering their average call time. Aplt.App. at 224.

**SWBTC's Relevant Employment Policies**

SWBTC maintains both an Equal Employment Opportunity Policy and a Harassment Policy. Aplt.App. at 229-39. The EEO policy provides that SWBTC provides equal employment for all employees to protect them from unlawful discrimination and harassment based on protected classifications including disability. *Id*. DeWitt knew of SWBTC's non-discrimination policy, which she had to read from time to time. Aplt.App. at 183. SWBTC had an FMLA Policy that permitted employees to take protected leave and prohibited retaliation. Aplt.App. at 241-42.

**SWBTC's Workplace Conduct Policy**

SWBTC also maintains a Code of Business Conduct, which DeWitt reviewed periodically. Aplt.App. at 184; 244-59. The Code of Business Conduct establishes conduct rules—not just performance standards—and includes commitments to customers, including that SWBTC will "earn and preserve [the customers'] trust by treating them with honesty and integrity, and in a professional, courteous manner. [SWBTC does] not provide goods or services that customers did not authorize." Aplt.App. at 244-59. It also states, "[e]ach employee is responsible for being familiar with the information in this Code, and for following

7

the Code, and the Company's policies and guidelines. We understand that violation may result in discipline, up to and including termination of employment." *Id*.

**DeWitt's FMLA Leave**

At various times throughout DeWitt's employment, she took FMLA leave; and never had a request for FMLA leave denied. Aplt.App. at 195-96. No one ever said anything to DeWitt that suggested using FMLA or having diabetes would be negatively held against her. Aplt.App. at 221-22.

**SWBTC's Reasonable Accommodations of DeWitt's Diabetes**

Prior to March 3, 2010, DeWitt admits SWBTC always provided whatever accommodations she needed. Aplt.App. at 127, ¶7; 197. SWBTC permitted DeWitt to keep candy, juice, and other items at her desk as needed, and permitted her extra breaks to check her blood sugar levels and address any blood sugar issues. Aplt.App. at 262-64. The only accommodation DeWitt believes that SWBTC should have provided her was giving her more leniency by applying a different disciplinary standard, and allowing her to keep her job because she did not mean to drop the calls. Aplt.App. at 197-99.

**January 2010 Cramming Incident**

On January 21, 2010, DeWitt failed to delete a service plan from a customer's account after the customer declined the service, which was detected by DeWitt's immediate supervisor, Heumann. Aplt.App. at 127, ¶10; 278-79. DeWitt

understood "cramming" to be when a customer service representative deliberately puts services on a customer's account and does not tell the customer, and understood that "cramming" violates the Code of Business Conduct. Aplt.App. at 185-86. One incentive for a customer service representative to "cram" is to get sales numbers they would not otherwise get. Aplt.App. at 187-88. DeWitt agrees there should be serious consequences for cramming. Aplt.App. at 188-89.

**DeWitt's Discipline for Cramming**

A "Day In Court" is a meeting in which an employee can speak with someone "higher in the chain of command" than the first-level supervisor to explain why the incident was not as bad as thought; after the Day In Court the general manager makes the final disciplinary decision. Aplt.App. at 207-08; 319. Regarding the "cramming" incident, DeWitt was provided with a Day In Court on January 29, 2010, conducted by Baskett-McEnany. DeWitt did not dispute she added a service to a customer's account without the customer's approval, which she should not have done, but claimed it was a mistake, not intentional. Aplt.App. at 201-03; 265; 294.

After the Day In Court, Baskett-McEnany agreed to offer DeWitt a "Last Chance Agreement" as an alternative to discharge. Aplt.App. at 297. DeWitt signed the Last Chance Agreement on February 1, 2010. Aplt.App. at 127, ¶11; 209; 324. The Last Chance Agreement states, "[DeWitt] acknowledge[s] and

agree[s] that any discipline I have received up to and including the date of this Agreement was based on just cause...." Aplt.App. at 324. It also states,

> I agree that I will maintain satisfactory performance in all components of my job, including measurement, safety, attendance/punctuality, use of company resources, company policies, and conduct. Through this Agreement I acknowledge and understand that even one incident of failing to maintain satisfactory performance in all components of my job...may lead to further disciplinary action including dismissal. Aplt.App. at 324.

**March 2010 Customer Mistreats**

Hanging up on customers before a call is completed violates the Code of Business Conduct, and is a customer "mistreat." Aplt.App. at 193-94; 290; 295-96, 298. DeWitt understood it was improper for her to hang up on a customer call before it is complete because the customer will probably be upset, it would not make a good impression of SWBTC and could jeopardize the company's reputation. Aplt.App. at 190-92; 327.

On March 3, 2010, DeWitt hung up on at least two customers. *See* Aplt.App. at 282-87, 329. The hang ups were discovered when Heumann was reviewing DeWitt's calls for a one-on-one coaching session with DeWitt. Aplt.App. at 280-81. That same day, DeWitt participated in a suspension meeting with Heumann, Beth Kloxin, and Mary Tormey (Union Steward) during which the meeting participants reviewed the two calls for which there were "screenshots," which occurred at 3:53 and 3:54. Aplt.App. at 212-13; 282-83, 329. After the

meeting, DeWitt discussed with the union representative that she would probably be fired because she was on a Last Chance Agreement and had been presented with evidence she had hung up on two callers, which could "definitely be a terminable situation." Aplt.App. at 214-16.

Importantly, hanging up on a customer takes more than just putting down the phone receiver. A customer service representative must make multiple cursor movements on their computer screen, including:

a. the customer service representative must first click on the "Release" button on the CCTP Toolbar at the top of the screen;

b. after clicking the "Release" button, a second screen pops up in the middle of the screen, asking, "Do you want to hang up?";

c. The customer service representative then must move the cursor from the top of the screen where the CCTP Toolbar is to the middle of the screen where the "Do you want to hang up?" is and then must click the "Yes" button to hang up on the customer. Aplt.App. at 331-32.

On March 10, 2010, Baskett-McEnany held a Day In Court, where DeWitt and her union representative could tell Baskett-McEnany "anything" DeWitt wanted Baskett-McEnany to know regarding the dropped calls and "making a decision concerning [DeWitt's] employment." Aplt.App. at 305-07, 326-27. Prior to the Day In Court, Baskett-McEnany reviewed the suspension meeting minutes.

11

Aplt.App. at 317-18.    She also discussed with Rivera and Kloxin that the screenshots video indicated that DeWitt seemed to have capable control over the system.    Aplt.App. at 301-02.  DeWitt agrees that the notes from the Day In Court regarding the dropped calls accurately captured the substance of what occurred at the meeting. Aplt.App. at 217-18.

While Baskett-McEnany understood DeWitt was claiming the hang-ups were caused by her diabetes, based on the information presented to Baskett-McEnany, she believed that they were not accidents caused by DeWitt's diabetes and that DeWitt had most likely purposefully hung up on multiple customers because:

    a.    It is "very difficult" to accidently hang up on a customer.  DeWitt took specific discrete steps to hang up on multiple customers, which would have required a certain level of coherence;

    b.    DeWitt operated successfully the rest of the day, never asked for help and never told anyone that she did not feel well;

    c.    DeWitt participated in a team meeting that same day without incident;

    d.    DeWitt interacted with peers and colleagues throughout the day;

    e.    DeWitt was in close physical proximity to her peers – but identified no witnesses who might have noticed any impairment; there was no evidence that DeWitt had not negotiated the screens just fine;

f.      DeWitt took no action to go into auxiliary mode or otherwise take a break from taking calls, as she was permitted;

g.      DeWitt was interacting with a co-worker through an instant messaging service just before the first dropped call;

h.      Although Baskett-McEnany believed DeWitt to be an honest person, she was on a Last Chance Agreement with her job in jeopardy and people in such situations will say things to save their job.  Aplt.App. at 149-50; 299-302; 311-16.

Baskett-McEnany found it difficult to reconcile why DeWitt could remember with explicit detail events throughout the day, but could not remember the three to five minute period of time during which she dropped multiple calls. Aplt.App. at 313.  During the March 10 Day In Court, Baskett-McEnany—the decision-maker with ultimate authority—expressed that she is familiar with diabetes since she has family members, including her mother, who are diabetic. Aplt.App. at 308-10.

Rivera, after reviewing DeWitt's calls when she disconnected customers, also believed that DeWitt's conduct was consistent with purposefully hanging up on customers by taking multiple discrete actions.  Aplt.App. at 347-56; 359-60. Rivera, based on DeWitt's conduct, formed a belief that SWBTC should terminate DeWitt's employment for hanging up on customers.  Aplt.App. at 357-61.

After the March 10, 2010, Day In Court, Baskett-McEnany, in consultation with Rivera, made the decision to terminate DeWitt's employment because Baskett-McEnany, aware of the Last Chance Agreement, believed DeWitt had purposefully hung up on multiple customers and that it was not caused by her disability. Aplt.App. at 315-16; 320-21. Baskett-McEnany knew of no other employees who violated the terms of a last chance agreement who maintained their employment. Aplt.App. at 303-04. DeWitt is not aware of anyone who was on a last chance agreement and later involved in a situation involving hanging up on customers who was not discharged. Aplt.App. at 223.

SWBTC terminated DeWitt's employment effective March 15, 2010, notifying her that she was terminated for releasing calls, customer mistreats and Code of Business Conduct violations, and for violating the Last Chance Agreement. Aplt.App. at 15, ¶39; 127-28, ¶12.

Past and Future Undetected Mistakes

DeWitt agrees it is possible that her diabetes caused her to make other mistakes that were never detected (Aplt.App. at 206) and that if she had remained working at SWBTC, she would assume that similar situations could come up. Aplt.App. at 219.

**Other Employees**

Other customer service representatives who have violated the Code of Business Conduct for conduct similar to DeWitt's have been put on last chance agreements and those who subsequently breached them have been discharged. Aplt.App. at 363-64.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's order granting summary judgment to SWBTC on each of DeWitt's claims. The undisputed facts are that Dewitt, a customer service representative hung up on at least two customers only four weeks after agreeing to a Last Chance Agreement arising from her prior misconduct (cramming). Both incidents of misconduct violated SWBTC's reasonable workplace conduct rules, which are job related and a business necessity.

The undisputed facts are that DeWitt crammed a service on a customer in January 2010. On February 1, 2010, she signed a Last Chance Agreement acknowledging that one more misconduct violation could cause her termination. Four weeks later, DeWitt terminated at least two customer calls. After SWBTC discovered the hang-ups, SWBTC had a suspension meeting with DeWitt to review the calls and the screenshots. DeWitt did not deny that she hung up on the customers. A short time later, SWBTC investigated, which included the Day In Court proceeding at which DeWitt could provide anything she wanted the

individual making the decision regarding her employment to know about why DeWitt hung up on customers. After investigating, SWBTC terminated DeWitt's employment based on its honest belief that DeWitt likely intentionally terminated the customer calls.

The district court properly considered these facts in finding that DeWitt failed to establish a sufficient nexus or logical connection between her disability and her termination.

Consistent with the arguments herein, DeWitt failed to present a genuine issue of material fact to defeat summary judgment. Further, she failed to meet her *prima facie* burden to prove that she was qualified for her position and that the termination was because of her disability. Even if she were able to meet that burden, she failed to show that SWBTC's legitimate, nondiscriminatory reason for terminating her was pretext for unlawful discrimination. DeWitt's evidence did not show any implausibilities or inconsistencies such that a factfinder could reasonably infer that the true reason for terminating her employment was because of her disability or in retaliation for her having taken FMLA leave.

The district court properly granted summary judgment on DeWitt's failure-to-accommodate claim because the sole accommodation she requested after hanging up on multiple customers was a second chance and to be treated with more leniency than non-disabled employees. This finding was not only proper under the

relevant law, it is also consistent with the EEOC's guidance on this very issue. Consequently, the district court's grant of summary judgment on all claims was proper and should be affirmed.

## ARGUMENT

### Standard of Review

This review is *de novo*, applying the same standard as the district court.[1]  A defendant is entitled to summary judgment when a plaintiff fails to show a genuine issue of material fact.[2]  An issue of fact is genuine only when a reasonable jury could return a verdict for the nonmoving party on the question.[3]

DeWitt cannot rest upon mere allegations, speculation, or conjecture, but must present significant and specific probative facts in support of her complaint in order to defeat the motion; unsubstantiated allegations carry no probative weight in summary judgment proceedings.[4]  Employment discrimination cases are subject to the same standards as any other case.[5]  In addition, a federal court does not serve as

---

[1] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).
[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[3] *Horn v. Gov't Employees Ins. Co.*, 86 Fed.App'x. 405, 407 (10th Cir. 2004) (internal punctuation and citations omitted).
[4] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-250 (1986); *Larson v. United Air Lines*, 482 Fed.App'x. 344, 348 (10th Cir. 2012).
[5] *See Larson*, 482 Fed.App'x. at 348 (citing *Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) (naked speculation concerning the motivation for employment decisions is barred)).

a "super personnel department," second guessing the employer's honestly held business judgments.[6]

Even though this Court reviews the district court's order *de novo*, it does so "from the perspective of the district court at the time it made its ruling, ordinarily limiting [its] review to the materials adequately brought to the attention of the district court by the parties."[7]  The *Fye* Court went on to explain:

> [T]he special importance of bringing supportive facts to the attention of the district court in an employment discrimination case.  Because of the sheer volume of the record in such cases, a party cannot expect the district court to comb the record and make the party's case for it.[8]

Further, a party's failure to present specific facts by referring to exhibits and the then current record are not reasons to reverse a district court's grant of summary judgment.[9]

---

[6] *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs").

[7] *Fye v. Oklahoma Corp. Com'n*, 516 F.3d 1217, 1223 (10th Cir. 2008) (quoting *Adler*, 144 F.3d at 671).

[8] *Id.* (*citing Adler*, 144 F.3d at 672); s*ee also Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1025 (10th Cir. 1992), *cert denied*, 506 U.S. 1013 (1992); *Downes v. Beach*, 587 F.2d 469, 471-72 (*quoting Bushman Constr. Co. v. Conner*, 307 F.2d 888, 892-93 (10th Cir. 1962)).

[9] *Adler*, 144 F.3d at 672 (citation omitted); *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996).

**ISSUE I    NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES JUDGMENT AS A MATTER OF LAW ON DEWITT'S ADAAA DISCRIMINATION CLAIM BECAUSE DEWITT FAILED TO ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION AND/OR THAT THE REASON FOR HER TERMINATION WAS A PRETEXT FOR UNLAWFUL DISCRIMINATION**

DeWitt incorrectly alleges that SWBTC discriminated against her because of her disability when, while on a Last Chance Agreement for prior misconduct, she violated a workplace conduct rule by disconnecting at least two customer calls. Contrary to DeWitt's arguments, no genuine issue of material fact exists to support reversing the district court's grant of summary judgment on her ADA discrimination claim. Further, DeWitt failed to sufficiently establish that the proffered reason for her termination was a pretext for unlawful discrimination.

The ADAAA prohibits discrimination against a qualified individual with a disability *because of* the disability.[10] Absent direct evidence of discrimination, the Tenth Circuit has consistently applied the *McDonnell Douglas*[11] burden-shifting framework to disability discrimination claims.[12] To state a *prima facie* claim of discrimination under the ADAAA, DeWitt must prove: (1) she was disabled as defined in the ADAAA; (2) she was a "qualified individual" meaning she can perform the essential functions of the job, with or without reasonable

---

[10] *Nealy v. Water Dist. No. 1*, 554 F.Supp.2d 1226, 1231 (D. Kan. 2008) (citations omitted).

[11] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[12] *See, e.g., Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 (10th Cir. 1999).

accommodation; and (3) SWBTC took adverse employment action against DeWitt because of her purported disability.[13]  If DeWitt establishes a *prima facie* case of discrimination, the burden of production (not persuasion) shifts to SWBTC to articulate a legitimate, non-discriminatory reason for the alleged adverse action. DeWitt then bears the ultimate burden to show the proffered reason is pretextual and that her disability was the reason for her discharge.[14]  Although the burdens of production shift, the ultimate burden of persuasion remains with DeWitt.

Importantly, whether SWBTC's decisions were good, fair, wise, or correct is immaterial.[15]  The court's role is not to act as a "super personnel department," second guessing the employer's honestly held business judgments.[16]

For summary judgment purposes and this appeal, SWBTC does not challenge that DeWitt is disabled as defined under the ADAAA.  DeWitt, however, has no "direct evidence" of unlawful intent and does not argue on appeal that she has direct evidence of unlawful intent.   Accordingly, a *McDonnell Douglas*[17] analysis is appropriate.

---

[13] *Id.*

[14] *Id*.

[15] *Young*, 468 F.3d at 1250 (noting that the "relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs").

[16] *Id*. For reasons addressed in Section I.D, the honest belief rule is consistent with controlling authority and applicable laws.

[17] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011).

**A.    DeWitt Failed to Meet Her Required *Prima Facie* Burden to Show Disability Discrimination.**

**1.    DeWitt is not a "qualified individual with a disability" within the meaning of the ADAAA.**

The district court assumed that DeWitt was a qualified individual with a disability.  DeWitt was not, however, a qualified individual with a disability.

DeWitt premises her ADAAA claim on being an insulin-dependent diabetic and, because of that, she alleges that SWBTC discriminated against her by terminating her employment after her violation of workplace conduct policies.  The ADAAA, however, only prohibits discrimination against an individual who is a "qualified individual with a disability," which DeWitt would only be if she could perform the essential functions of her job with or without reasonable accommodations.

Here, communicating with customers and providing them with customer service is an essential job function, if not *the essential* job function, of a customer service representative.  Aplt.App. 127, ¶¶5,7; 181-82; 220; 226-27.  DeWitt relies primarily on her past performance to establish that she is a qualified individual.  That reliance is misplaced because she "may not rely upon past performance to establish that she is a qualified individual without accommodation when the

employer has produced undisputed evidence of diminished or deteriorated abilities."[18]

DeWitt's own testimony is evidence of diminished or deteriorated abilities. Significantly, DeWitt concedes that similar situations could happen again. Aplt.App. 206; 219.  DeWitt was allowed every accommodation she believed she needed to control her blood sugar, but—she says—those measures were insufficient on March 3rd to allow her to fulfill her job duties.  Aplt.App. 127, ¶7; 197; 262-64.  Despite her efforts to "treat" herself, she hung up on multiple customers.  Aplt.App. 217-18.  Additionally, at her Day In Court she said as time goes on she is "less likely" to recognize "signals" in advance to be able to ask for help or stop taking calls: "Unfortunately the longer you have it the less likely you get the signals, you don't always appear to get signals and sometimes the blood sugar drops and you are there."  Aplt.App. 217-18.

While acknowledging that such situations were possible, and apparently more likely in the future, DeWitt never articulated a different or additional accommodation that would ensure going forward she would not mistreat customers.  Her only requested accommodation—made after she understood she was "probably going to be fired" (Aplt.App. 193-94; 212-16; 282-83; 290; 295-95; 298; 329)—was to be given leniency.  Aplt.App. 197-99.  But being allowed to

---

[18] *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1217 (8th Cir. 1999).

remain employed does nothing to address the root problem, i.e., that despite her best efforts, her diabetes might cause her to be uncommunicative with customers, hang up on them, etc.   The accommodation of "leniency" or "retroactively excusing" her conduct would not enable her to fulfill her essential job functions and is not a reasonable accommodation.   Consequently, she was not a "qualified individual with a disability."

> **2.** **SWBTC's Termination of DeWitt's Employment was not Because of Her Purported Disability.**

The final prong of the *prima facie* claim requires DeWitt to present "some affirmative evidence that [the] disability was a determining factor in the employer's decision."[19]   Or, as stated by the district court, DeWitt must show a nexus, or "at least a logical connection" between her disability and her termination. Aplt.App. at 549.   The district court notes DeWitt attempts to do so by providing circumstantial evidence, which implicates the familiar *McDonnell Douglas* burden-shifting framework.   Aplt.App. at 549-50.

Importantly, DeWitt provided no evidence that SWBTC took action against her intending to discriminate against her because of her diabetes.   She maintains that burden of persuasion, which the district court correctly found she failed to satisfy.

---

[19] *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted).

As explained in Sections I.C and I.D, there is no evidence that suggests SWBTC was motivated by any discriminatory motive. DeWitt has offered nothing but speculation and conjecture that the reason for her termination was her disability. DeWitt has presented no direct evidence (i.e. comments, statements, etc.) and no sufficient indirect evidence that SWBTC terminated her because of her disability.

Courts have recognized that ADAAA plaintiffs cannot avoid summary judgment when they have a controllable condition but fail to control it, which causes them to violate important work rules or otherwise fail to perform essential job functions. In these circumstances, the legal cause of their discharge is not their disability, but their failure to control that disability.[20] Consistent with this and other applicable precedent, the district court correctly found that DeWitt failed to set forth a *prima facie* case of disability discrimination because she failed to provide

---

[20] *Siefken v. The Village of Arlington Heights*, 65 F.3d 664, 667 (7th Cir. 1995) (cited by *Koeughan v. Delta Airlines, Inc*., 113 F.3d 1246, 1997 WL 290961, at *2 (10th Cir. May 27, 1997))(ruling that diabetic employee who drove erratically through residential area and was disoriented with memory loss due to failure to control his blood sugar failed to state a claim under ADA; cause of his discharge was failure to control diabetes); *Burroughs v. City of Springfield*, 163 F.3d 505, 507 (8th Cir. 1998)(affirming summary judgment against diabetic police officer who failed to control his blood sugar causing diabetic event that caused him to become dysfunctional while on-duty—discharge was not "because of" his disability; it was because he had failed to control his (controllable) medical condition that caused performance issue).

sufficient evidence of a nexus or logical connection between her disability and her termination.

DeWitt and the EEOC both dedicated a considerable portion of their arguments to whether the "honest belief" doctrine should be applied in this case and whether it "eviscerated" the third prong of the *McDonnell Douglas* framework. That argument lacks merit and is unsupported by Tenth Circuit precedent.[21]  As discussed in Sections I.C and I.D, the district court did not blindly accept SWBTC's legitimate reason without evaluating whether DeWitt provided sufficient evidence to prove that the termination reason was pretextual. Aplt.App. at 549-54. The district court considered DeWitt's pretext arguments and found them insufficient to establish the required nexus to rebut SWBTC's legitimate, non-discriminatory and non-retaliatory reason for her termination – a duty squarely within the district court's purview. Aplt.App. at 554. The district court's findings were proper.

### B.    SWBTC Established a Legitimate Non-Discriminatory Reason for DeWitt's Termination.

Contrary to DeWitt's unfounded arguments otherwise, DeWitt was discharged for a legitimate, non-discriminatory reason – she released two customer

---

[21] Other Tenth Circuit cases applying the honest belief doctrine include: *E.g., Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1260 (10th Cir. 2001); *Morgan*, 108 F.3d at 1323-24; *Ainsworth v. Indep. Sch. Dist. No. 3 of Tulsa Cnty., Okla.*, 232 F. App'x 765, 773 (10th Cir. 2007)

calls, a violation of SWBTC's workplace conduct rules, **while on a Last Chance Agreement**.   DeWitt acknowledges that hanging up on customers is serious misconduct and violates the Code of Business Conduct.   Aplt.App. 190-94; 214-15; 290; 295-96; 298.   Firing an employee for such conduct is lawful, non-discriminatory, and non-retaliatory, as is taking action for a Last Chance Agreement violation.[22] SWBTC articulated a legitimate, non-discriminatory reason for terminating DeWitt's employment.

SWBTC notes that although found in the failure-to-accommodate portion of her brief, DeWitt's statement that this case is a "disability-caused misconduct" case is unavailing for her ADAAA discrimination claim.   The most relevant parts of the *EEOC v. Walgreen Co.*[23] case pertain to whether, how, and in what circumstances an employer must *accommodate* disability-caused misconduct, and

---

[22] *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (noting last chance agreement breach as legitimate reason to discharge); *See also Klaper v. Cypress Hills Cemetery*, 10-CV-1811 NGG LB, 2014 WL 1343449, at *6-7 (E.D.N.Y. Mar. 31, 2014)(collecting cases in ADAAA context and stating that although the "court may believe that CHC's decision to terminate Klaper on the basis of his failure to report for work … was harsh, the ADAAA does not compel an employer to excuse an employee's breach of a "last chance agreement")); *see Ostrowski v. Con–Way Freight, Inc*., 543 Fed.App'x 128, 131 (3d Cir.2013) ("Because the [return to work agreement] was not invalid under the ADA, [Plaintiff's] violation of its terms was a legitimate, non-discriminatory reason" for him to be terminated).

[23] 34 F.Supp.3d 1049 (N.D.Cal. 2014).   SWBTC notes that DeWitt also makes a passing reference to *Dark v. Curry County*, 451 F.3d 1078 (9th Cir. 2006).   The analysis is very similar in both cases and in both cases, the defendants considered as part of the termination decision the plaintiffs' disabilities.   That is not the case here.

SWBTC addresses those issues below in the failure-to-accommodate claim. However, with regard to a straight-forward ADA discrimination claim, the *Walgreen* court also ruled that the plaintiff need not show pretext (third prong of *McDonnell Douglas*) because an employer's reliance on disability-related misconduct as a basis for discipline is inherently not non-discriminatory (and thus does not satisfy the second prong of *McDonnell Douglas*).[24]

That conclusion may make some sense where the parties agree that the misconduct at issue was caused by the plaintiff's disability.[25] But when an employer, such as SWBTC, has "disclaimed reliance" on the employee's disability as being the reason for its action and otherwise offered a legitimate reason (such as the violation of a uniformly applied work rule that is job-related and consistent with business necessity), the *Walgreen* conclusion does not make sense. What must be decided is whether there is sufficient evidence that SWBTC acted with an intent to discriminate, which is the purpose of *McDonnell Douglas* framework, and in particular its requirement to show pretext.[26] Of course, in such cases if a plaintiff can prove—contrary to the employer's stated reason for discharge—the real reason

---

[24] *Walgreen*, 34 F.Supp.3d 1059.

[25] *See Klaper*, 2014 WL. 1343449, at *6 (noting that when "the parties agree that employer complains of conduct that is direct result of the employee's disability . . . there is no need to evaluate [pretext]") (citing *McMillan v. City of New York*, 711 F.3d 120, 129 (2d Cir. 2013)).

[26] *See Beaird v. Seagate Tech., Inc*., 145 F.3d 1159, 1167 (10th Cir. 1998)(noting that purpose of *McDonnell Douglas* method is ease burden of having to uncover "evidence of discriminatory intent").

was because of the plaintiff's disability, the employer may be liable. And, alternatively, on the same facts a plaintiff (as DeWitt is doing) may try to hold an employer liable under a failure-to-accommodate theory, which is analyzed differently and does not require proof of intent to discriminate or involve *McDonnell Douglas* burden shifting.[27] But when, as in this case, there is no agreement that the employer believed the conduct leading to the adverse action resulted directly from the employee's disability, DeWitt must show that SWBTC's stated reasons for terminating her—violation of the Last Chance Agreement and the Code of Business Conduct—were pretextual.

In sum, a "disability-caused misconduct" analysis does not apply here, but even if it does, the EEOC Guidance analyzed below demonstrates that for purposes of *McDonnell Douglas* burden-shifting, SWBTC's stated reason for firing DeWitt was still lawful and non-discriminatory.[28] Therefore, to defeat summary judgment on her ADAAA discrimination claim, DeWitt must satisfy the third prong of *McDonnell Douglas* burden shifting, and bring forth sufficient evidence that

---

[27] *Palish v. K & K RX Servs.*, *L.P.*, 13-CV-4092, 2014 WL 2692489, at *5 n.14 (E.D. Pa. June 13, 2014)(noting that although failure to make a reasonable accommodation and disparate treatment both fall within the definition of "discrimination" under 42 U.S.C.S. § 12112(a), (b), the two are distinct claims and are analyzed differently, with disparate treatment claims being analyzed pursuant to the burden-shifting framework of *McDonnell-Douglas*).

[28] The EEOC Guidance analyzed in Section II provides that an employer may still discipline an employee for misconduct.  Section II, *infra*.

SWBTC's stated reason for her firing is pretextual. To the extent *Walgreen* suggests otherwise, its analysis is unsound and should not be followed.

### C.    DeWitt cannot show pretext.

Pretext can be shown by such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered legitimate reasons that a reasonable fact finder "could rationally find them unworthy of credence."[29] Pretext can be established in a number of ways but is usually demonstrated with evidence that:  (1) defendant's stated reason for an adverse action is false; (2) defendant acted contrary to a written company policy prescribing the action be taken; or (3) plaintiff was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.[30]  No reasonable jury could conclude that SWBTC's stated basis for its discipline and termination decisions are pretextual.

Again, the role of the Court is not to second-guess SWBTC's decision and evaluate whether it was wise or fair, or even if other alternatives might have been better, or had less of an impact on DeWitt.[31]  The Court is merely to determine whether DeWitt provided evidence from which a factfinder could reasonably conclude SWBTC's decision was so implausible or inconsistent as to suggest an

---

[29] *Riggs v. Air Tran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007).

[30] *See Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004).

[31] *Young*, 468 F.3d at 1250.

unlawful motive.  Here, DeWitt failed to meet her evidentiary burden to raise a question of pretext or unlawful intent.

Attempting to demonstrate pretext, DeWitt asserts several arguments, none of which connect her termination to her disability.

### 1.    The district court properly held that the decision-makers acted reasonably based upon information known at that time.

In analyzing pretext, courts must look at the facts as they appear to the person making the termination decision.[32]  DeWitt attempts to show pretext by claiming that Baskett-McEnany's testimony was inconsistent regarding whether DeWitt "intentionally" crammed a service on a customer in January 2010, a few months before her termination.  The material facts regarding that issue are not in dispute.

DeWitt does not dispute: (a) she left a service on a customer account after the customer had declined the service (Aplt.App. 127, ¶10; 278-79); (b) she (after consultation with her union representatives) agreed to the Last Chance Agreement, acknowledging that she agrees that any discipline up to and including the date of this agreement was based on just cause ..." and also confessing that she engaged in cramming (Aplt.App. 127,¶11; 209, 324), and (c) cramming is an offense for which she agrees there should be "serious consequences." Aplt.App. 188-89.

---

[32] *Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

DeWitt does not point to any alleged inconsistency as to SWBTC's stated reason for discharging her, i.e. that she disconnected calls, which constituted a serious "customer mistreat" in violation the Code of Business Conduct and her Last Chance Agreement.

Instead, she wrongly claims that the circumstances of her Last Chance Agreement for cramming *in January* suggest pretext for the discharge decision after the dropped calls *in March*. DeWitt overstates the alleged inconsistency about whether Baskett-McEnany believed it was a mistake. But the alleged "inconsistency" about the cramming incident is immaterial. Mistake or not, it is undisputed that DeWitt left a service on a customer account after the customer told DeWitt no thanks and, but for the "mistake" being caught by a supervisor, the customer would be billed for unwanted services. No intent is required to find that DeWitt crammed an unwanted service on a customer's account, which is a violation of the Code of Business Conduct and Federal Regulations.[33]

---

[33] "Cramming" is an illegal and fraudulent practice that occurs when a consumer has not authorized a charge that appears on their bill. *See*, *Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges ("Cramming")*, Report and Order and Further Notice of Prosed Rulemaking, CG Docket No. 11-116, FCC 12-42 (2012)(Cramming Order). As the FCC pointed out in its *Cramming Order*, the FCC "previously has determined that cramming is an unjust and unreasonable practice prohibited by section 201(b) of the Act, and has adopted Truth-in-Billing rules in part to address cramming." *Cramming Order*, Para. 4 & n.6 (citing to 47 C.F.R. §§64.2400-64.2401).

That SWBTC "could have" not disciplined DeWitt is immaterial; an employer always has the theoretical option of not disciplining employees regardless how serious the misconduct (here DeWitt's conduct is illegal under FCC regulations and could expose SWBTC to significant legal exposure) or otherwise using its business judgment in an unsound way. What is material is not what far-fetched disciplinary options SWBTC had, but what SWBTC did, and whether such evidence suggests pretext. Here, DeWitt offers no evidence of anyone avoiding discipline after a cramming incident. Giving DeWitt the benefit of the doubt, she still made a serious "mistake" and DeWitt does not offer any evidence of others being treated more favorably in similar circumstances as to suggest pretext. Nothing suggests that offering DeWitt the Last Chance Agreement is so implausible or inconsistent as to show pretext, much less concerning her discharge months later.

### 2. Kloxin's alleged comment cannot create an inference of unlawful intent because she was neither a decision-maker nor influenced the discharge decision.[34]

The district court appropriately addressed Kloxin's overstated alleged animus and gave DeWitt the inference this statement was made, even though denied by Kloxin. The court recognized the decision-makers here (Baskett-

---

[34] DeWitt improperly relies upon documents and facts not before the district court for arguments regarding Kloxin's alleged animus, including Kloxin's duties. This information was not before the district court and should not be considered. *Fye*, 516 F.3d at 1223 (quotation omitted).

McEnany and Rivera) made their decision based on Baskett-McEnany's own experiences and her reasonable investigation (including the Day In Court proceedings). The district court stated:

> Kloxin was not a decision-maker in [DeWitt's] termination, and the record fails to show that Baskett-McEnany had any knowledge of Kloxin's actions or that she or Rivera shared Kloxin's motive or sentiments. To the contrary, Rivera told Kloxin her behavior was inappropriate, and [DeWitt] alleges that Rivera recommended that she *not* be terminated and did not believe her hang-ups were intentional.

Aplt.App. at 554 (emphasis in original). There is no evidence that Kloxin's statements or motive influenced Baskett-McEnany or Rivera. Further, because this is not a situation in which the decision-maker(s) exclusively relied on Kloxin's "say so" but instead obtained information from others (including DeWitt herself), as a matter of law Kloxin cannot be a "biased subordinate" and her role (and alleged conduct/comments) is immaterial.[35]

### 3. Nothing about SWBTC's investigation into the dropped calls suggests pretext.[36]

DeWitt points to (only) two things in arguing SWBTC's investigation into the dropped calls shows pretext: (1) the content of the separation proposal papers

---

[35] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (employer may defeat the inference that an employment decision was a product of reliance on a biased subordinate by "simply asking an employee for his version of events," and not "rely[ing] exclusively on the say-so of the biased subordinate").

[36] Here, DeWitt improperly relies on documents about Kloxin's duties (overstated as they may be) which were never part of the summary judgment record below. They are not properly before this Court and should not be considered.

and (2) what Baskett-McEnany considered from the investigation, i.e., that DeWitt became locked out of her computer. DeWitt's argument is misplaced.

Kloxin was not a "biased subordinate" who tainted the decision-making process, and the district court properly disposed of this argument. Moreover, the fact that information about the Day In Court proceedings was not included in the separation proposal papers is hardly a "disturbing procedural irregularity" as to suggest pretext, and Baskett-McEnany participated in the Day In Court. The undisputed evidence that DeWitt conveniently ignores is that the regular procedure—as done with DeWitt—is that separation proposals are prepared before a Day In Court and reviewed in advance by human resources. The idea is to allow Baskett-McEnany to promptly proceed with the discharge if that is her final decision, unless of course, she decides based on information at the Day In Court to choose a less stringent discipline.[37]

There is no evidence that the information included in DeWitt's separation proposal materially differed from those that Kloxin had been charged with

---

[37] Although administratively involved in collecting information for DeWitt's separation proposal, Kloxin did not make the termination decision. Aplt.App. 361. Typically, anytime a customer service representative is believed to have engaged in conduct warranting suspension, Kloxin would start preparing a separation proposal so employee relations could review and advise in advance of the Day In Court. Aplt.App. 268-71. Baskett-McEnany may decide based on the Day In Court not to proceed with discharge but if she does, the idea is to have paperwork already reviewed so that the decision can be implemented promptly. Sometimes due to delays in the review process the Day In Court will precede final separation proposal review. Aplt.App. 272-75.

preparing for other employees. Perhaps most significantly, there is no evidence that DeWitt would not have been discharged if information at the Day In Court had been included or if additional years of "meets or exceeds" expectations had been noted.[38]    Although ultimately not believing her medical condition caused the dropped calls, Baskett-McEnany already understood DeWitt was a long-time, "good" employee (Aplt.App. at 539-40); thus listing a few more years of her employment history would make no difference in the discharge decision.

Regarding the sufficiency of Baskett-McEnany's investigation, Tenth Circuit law makes clear that the scope and adequacy of an employer's pre-discharge investigation is a "matter of business judgment" and that any alleged investigative shortcomings do nothing to show pretext.[39]    More than once this Circuit has rejected the notion that failing to even interview an accused employee

---

[38] Although the separation proposal documents were not changed, Baskett-McEnany obviously knew what had transpired at the Day In Court because she participated in the meeting and employee relations representatives who received the separation proposal were, in fact, told about the Day In Court.

[39] *Estate of Daramola v. Coastal Mart, Inc.*, 170 Fed.App'x 536, 543-44 (10th Cir. 2006) (noting that fact supervisors did not view the plaintiff's explanation of equipment problems as a plausible explanation of the shortages was not "so idiosyncratic or questionable" to constitute evidence of pretext and that "failure to make other inquiries" as to the employee's explanation did not make summary judgment inappropriate); *Ainsworth*, 232 Fed.App'x at 774 (whether additional witnesses should have been interviewed was a "matter of business judgment" that court will not revisit).

before firing them shows pretext.[40]  Here, SWBTC allowed DeWitt—with the aide of her union representative—to tell her side of the story, both at an initial March suspension meeting and in the Day In Court.  After giving DeWitt the opportunity to say "anything" she wanted Baskett-McEnany to know (Aplt.App. 305-07; 326-27), for a litany of reasons, Baskett-McEnany (whose mother is diabetic) believed that the dropped calls were not due to DeWitt's medical condition.[41]  Aplt.App. 299-302; 311-16; 320-21; 331-43.  The fact that DeWitt says otherwise is immaterial and there is no reason to have a jury trial to figure out whether Baskett-McEnany's decision was correct.  As the Tenth Circuit has explained, even if DeWitt "was entirely honest with [her] interviewers and [SWBTC] erred in believing [she] was being deceitful, no pretext is shown."[42]  Rather, "[w]hat matters is whether [defendant] could have reasonably believed that company policy had been violated."[43] And here, Baskett-McEnany could have, and did,

---

[40] *See, e.g., Riggs*, 497 F.3d at 1119 (affirming summary judgment and noting that getting the accused's side of the story might have been more fair, but failure to do so was not evidence of pretext); *Cooper v. Wal-Mart Stores, Inc.*, 2008 WL 4597226, at *9-10, 296 Fed.App'x 686, 695-96 (10th Cir. Oct. 10, 2008).

[41] A representative might intentionally drop calls to lower the "average call time," something that DeWitt had been recently coached on. Aplt.App. 200; 211; 224. Moreover, because only a small fraction of calls are reviewed, it is statistically a very low likelihood that instances of dropped calls (for any reason) will come to SWBTC's supervisor's attention.

[42] *Anderson v. Union Pac. R. Co.*, 529 F.Supp.2d 1270, 1281 (D.Kan. 2008) (citation omitted).

[43] *Id.*

36

reasonably believe that was the case regarding the dropped calls.  Aplt.App. 299-302; 311-16; 320-21; 331-43.

Despite DeWitt's protest of innocence, after giving DeWitt (and her union representative) a full opportunity at the Day In Court to explain why she hung up on customers, Baskett-McEnany felt the weight of the evidence did not support DeWitt's claim that the dropped calls were an accident caused by DeWitt's diabetes.  Aplt.App. 299-302; 305-07; 311-18; 320-21; 326-27; 331-44.  In coming to that conclusion, Baskett-McEnany reasonably considered:

> ➢ DeWitt took specific discrete steps to hang up on multiple customers which would have required a certain level of coherence since it is difficult to "accidentally" drop a call.

> ➢ DeWitt operated successfully the rest of the day - never asking for help or telling anyone that she did not feel well.

> ➢ DeWitt participated in a team meeting that day without incident.

> ➢ DeWitt interacted with her peers and colleagues throughout the day.

> ➢ DeWitt was in close physical proximity to her peers – but could not identify anyone who might have noticed any impairment; there was no evidence that DeWitt had not negotiated the screens just fine.

> ➢ DeWitt did not go into auxiliary mode or take a break from accepting calls as she was permitted.

➢ DeWitt interacted with a co-worker through instant messaging just before the first call she dropped.

➢ Although Baskett-McEnany believed DeWitt to be a generally honest person, she was on a Last Chance Agreement with her job in jeopardy and people in such situations will say things to try and save their job.

Aplt.App. 299-302; 305-07; 311-18; 320-21; 326-27; 331-44.

The facts here are a far cry from situations in which the nature of an investigation could reasonably show pretext.[44] Moreover, even with the benefit of full formal discovery, DeWitt cannot proffer what exact additional investigatory steps could have been done to better assess what really happened or how they were likely to help her case. For instance, although repeatedly mentioning that she had locked herself out of her computer, she does not identify what should have been done to figure out whether the reason DeWitt was locked out of her computer had anything to do with her diabetes. Ultimately, nothing about the investigation into the dropped calls suggests pretext for discrimination. DeWitt only asks this Court to second guess Baskett-McEnany's conclusion or how she weighed the evidence before her. That is exactly the "super personnel department" type of second-guessing that courts cannot do. Based on the ample evidence suggesting that the

---

[44] *See, e.g., Smothers*, 740 F.3d at 543.

termination decision was justified and genuine, and that disability was not a factor in the decision, the district court's decision should be affirmed.

### D. The District Court's Application of the "Honest Belief" Doctrine follows Tenth Circuit Law and the ADAAA.

As an initial matter, SWBTC notes that DeWitt advances this new argument for the first time on appeal – that the "honest belief" doctrine should not apply to this case. This argument, as it relates to the applicability of the "honest belief" doctrine or whether that doctrine eviscerates the third prong of the *McDonnell Douglas* framework, should not now be considered by this Court because it is being presented for the first time on appeal.[45]

Further, DeWitt incorrectly asserts that the honest belief doctrine should not apply here because there are competing explanations for the disconnected calls – disability-based versus purposeful. This alleged factual dispute creates no genuine issue of material fact to preclude summary judgment, and the district court did not improperly weigh credibility evidence as suggested by DeWitt. In every discrimination case involving a termination, the employer proffers one reason for the termination and the employee alleges that the termination was discriminatory. Where the plaintiff relies on circumstantial evidence to prove discrimination, the *McDonnell Douglas* framework assists the court in ferreting out whether there is sufficient evidence of a nexus between the protected characteristic and the adverse

---

[45] *Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1232-33 (10th Cir. 1997).

action.  In doing so, courts evaluate evidence including seriousness of different offenses,[46] frequency and dollar values of misconduct,[47] and seriousness of dishonestly displayed by the plaintiff.[48]  A court may also properly determine if a party has failed to "produce sufficient evidence to carry its burden of persuasion."[49]

DeWitt's conclusion that the district court ignored or misstated evidence, or drew inferences in favor of SWBTC is absolutely wrong.  For instance:

> ➢ January 2010 Cramming – DeWitt asserts that her "cramming" was unintentional and there were other available discipline alternatives. Contrary to DeWitt's reliance on this issue and Dina Bottalla's recollection of what Baskett-McEnany may have said, Bottalla testified that intent does not matter as the definition of "cramming" under the Code of Business Conduct is "adding something onto a customer's account that they didn't ask to be added on."  Aplt.App. at 497-98; 530-31.  The fact that DeWitt did that, which is illegal under FCC Regulations, is undisputed, and DeWitt's reliance on intent is immaterial.

---

[46] *Cooper*, 296 Fed.App'x. at 694.
[47] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1121 (10th Cir. 2007).
[48] *Rivera v. City & County of Denver*, 365 F.3d 912, 923-24 (10th Cir. 2004).
[49] *Riggs*, 497 F.3d at 1116.

➢ Severity of How DeWitt Felt and What an Interested Union Representative Said at the Day In Court[50] – The district court properly recited the undisputed facts, including DeWitt's belief that the hang ups were because of her diabetes, DeWitt's alleged lack of intent, and her lack of a recollection for a 3-5 minute period. DeWitt's subjective and speculative beliefs are immaterial.[51] That the district court did not recite the facts as alleged by DeWitt does not make it reversible error. There was no improper credibility analysis here. Last, whatever a union representative said about DeWitt's past performance is immaterial to whether she was lawfully terminated for hanging up on multiple customers.

➢ Medical Record – DeWitt minimizes the court's analysis and review of the medical record. The district court sustained SWBTC's objection regarding the medical record because DeWitt had no foundation for her argument that the times on document were off by one hour or that SWBTC had a copy of this document when making

---

[50] The cited document is the Day In Court notes. DeWitt provides no citation for where she referred the district court to the Day in Court notes for the "severity" of her "medical emergency." The district court has no obligation to scour the record to find evidence to support a party's position, nor should this Court find error in the district court not relying on that document. *Adler*, 144 F.3d at 672.

[51] *Lay v. Horizon/CMS Healthcare Corp.*, 60 F.Supp.2d 1234, 1238-39 (D.Kan. 1999).

its decision.  DeWitt incorrectly states that SWBTC did not object to the document.[52]  Last, there is no support for the idea that the district court was under an obligation to ask DeWitt for a legible copy of the document *she submitted*.  Contrary to DeWitt's argument, the district court gave DeWitt the inference here and even included her blood sugar levels in its statement of facts as found on the face of the document.

➢  <u>Presentation of blood sugar readings</u>.  The district court's finding is correct.  First, the "medical record" shows on its face that the blood sugar levels were "Reported" the day after the Day In Court. Aplt.App. at 469A. Second, the Day In Court minutes, which DeWitt confirmed as correct, do not evidence that DeWitt presented either document detailing her blood sugar level to Baskett-McEnany at the Day In Court.   Aplt.App. at 149 (SOF 41); Aplt.App. at 326-27; Aplt.App. at 377 (SOF 41 Uncontroverted by DeWitt).

➢  <u>Garcia's Declaration</u>.  The court properly addressed what reasonable inferences may be drawn from a declaration lacking in personal knowledge when the declarant's employment ended about 1.5 years

---

[52] SWBTC objected to the medical record stating, "First, there is no foundation to support the blood sugar readings and whether the blood sugar machine correctly determined what DeWitt's blood sugar level was at any point in time during the day in question..."  Aplt.App. at 498.

before DeWitt's termination, declarant was not involved in the decision to terminate DeWitt, and the lack of a nexus between declarant's statements and DeWitt's termination. There is nothing improper about the district court's determination about what inferences could or could not reasonably be made from Garcia's declaration. Aplt.App. at 552; *see* 495-97; 521-23.

➤  Kloxin's Role. In overstating Kloxin's role, DeWitt improperly relies on documents not part of the summary judgment record. She cites to pages 74, 87, 117-18, none of which were cited or referred to in the summary judgment briefing. Those documents are not properly before this Court. Also, the court made determinations regarding what reasonable inferences a factfinder could make based on the information before it at the time. Aplt.App. at 554; *see* 384; 499. The district court's findings were proper.

DeWitt's attempt to find error in the district court's review of the evidence presented to it is insufficient and does not justify reversal.

**1.    The "Honest Belief" Doctrine is a Key and Integral Part of the *McDonnell Douglas* Framework and Consistent with U.S. Supreme Court and Tenth Circuit Jurisprudence.**

DeWitt incorrectly argues that the district court's inquiry ended once it concluded that Baskett-McEnany believed that DeWitt intentionally disconnected

the calls, which was the reason for her termination. Quite the contrary is true. The district court properly accepted as true that Baskett-McEnany believed that DeWitt had intentionally disconnected the calls in violation of her Last Chance Agreement. This is the district court's role under the *McDonnell Douglas* framework. As argued herein, the district court's reliance on the proffered reason for termination is proper until DeWitt produces sufficient admissible evidence to establish pretext – which she failed to do.

Applicable law requires a plaintiff to prove that the employer intentionally discriminated against him/her.[53] Meeting that *prima facie* case of discrimination does not establish the intent to discriminate – it creates only an inference of discrimination.[54] That inference can be rebutted by the legitimate non-discriminatory reason for termination presented by the employer.[55] The burden for both the *prima facie* case and the non-discriminatory reason is merely a burden of production; as such neither is an onerous burden.[56]

The burden then shifts back to the employee to provide sufficient evidence of the real reason for termination, i.e., the evidence of pretext.[57] This evidence must call into question the employer's reason for termination or meet the burden of

---

[53] *Selenke*, 248 F.3d at 1259.

[54] *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) (citations omitted).

[55] *Id*. at 255.

[56] *See id.* at 255-56.

[57] *Id.*

persuasion that something more nefarious might be at play.[58] DeWitt's burden of persuasion requires more than just that the employer "got it wrong"[59] because "an employer's exercise of erroneous or even illogical business judgment does not constitute pretext."[60]  This is key because the employee always maintains the duty of persuasion – that the employer intentionally discriminated against the employee.[61]  "[T]he factfinder must be able to conclude, based on a preponderance of evidence, that discrimination was a determinative factor in the employer's actions – simply disbelieving the employer is insufficient."[62] It is the employee's duty to present sufficient evidence that a factfinder could make a reasonable determination that a preponderance of the evidence supports a finding of intentional discrimination.[63]

As discussed in Section I.C, the employee's proof of pretext can be done in many ways, and whether a court finds that the employer honestly believes its

---

[58] *Id.* at 256.

[59] *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) ("To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong.").

[60] *Bullard v. Goodyear Tire & Rubber Co.*, 09-4024-SAC, 2011 WL 4092192 at *17 (D. Kan. Sept. 14, 2011) (citing *C.R. England, Inc.*, 644 F.3d at 1044 (quoting *Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1535 (10th Cir.1995)).

[61] *Burdine*, 450 U.S. at 253.

[62] *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).

[63] *Burdine*, 450 U.S. at 256; *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007).

reason for termination provides no impenetrable armor to the pretext analysis. The plaintiff must provide sufficient evidence to call into question the proffered legitimate, non-discriminatory reason for termination. For instance, the court could find that Baskett-McEnany honestly believed that DeWitt's disability was not responsible for the dropped calls but that non-disabled employees had not been fired in similar circumstances to create a question of pretext. That evidence does not exist here, but shows that the "honest belief" doctrine does not eviscerate a pretext analysis. Importantly, this is in keeping with the employee's burden of persuasion that the employer intended to discriminate against the employee because of his/her disability. The third prong of *McDonnell Douglas* framework is not eviscerated by the honest belief doctrine because if it were, as DeWitt suggests, virtually no case would get past summary judgment.

Further, DeWitt grossly misstates the *Stalter v. Wal-Mart Stores*[64] holding. That court did not, as she suggests, refuse to apply the honest belief doctrine. In fact, that court stated, "[w]e look not at the wisdom of the employer's decision, but rather at the genuineness of the employer's motive."[65]  The *Stalter* court did exactly what DeWitt says is not possible – it found sufficient evidence of pretext to

---

[64] 195 F.3d 285 (7th Cir. 1999).
[65] *Id.* at 289 (citation omitted).

raise a question about Wal-Mart's true motivations.[66]   *Stalter* is consistent with Tenth Circuit law.

### 2. DeWitt's reliance on *Smith v. Chrysler Corp.*[67] is inconsistent with Tenth Circuit law.

The district court's finding of a lack of pretext, based in part on the "honest belief" doctrine, is consistent with Tenth Circuit precedent.  DeWitt argues that this Court should alter the honest belief doctrine as it relates to discrimination claims in favor of the Sixth Circuit's framework – requiring the "employer to demonstrate that its belief was reasonably grounded on particularized facts that were before it at the time of the employment action."[68]

First, as discussed above, this showing is inconsistent with the *McDonnell Douglas* framework as it relates to the burden of production of the employer's legitimate, non-discriminatory reason for termination.  Second, DeWitt's argument based on *Smith* is premised on her false assumption that Baskett-McEnany's termination decision was based on a "fundamental ignorance of diabetes." DeWitt's subjective beliefs about Baskett-McEnany's termination decision are immaterial.[69] DeWitt provided no admissible evidence[70] of Baskett-McEnany's ignorance of diabetes in March 2010 – the key period of inquiry.[71]

---

[66] *Id.* at 290-92.

[67] 155 F.3d 799 (6th Cir. 1998).

[68]  *Id.* at 806.

[69] *Lay*, 60 F.Supp.2d at 1238-39.

Instead, DeWitt relies on "simple internet research" while drafting her brief to argue that Baskett-McEnany was ignorant of diabetes. There has been no showing that DeWitt presented information regarding diabetes to Baskett-McEnany at the Day In Court or that Baskett-McEnany knew or did not know the specifics about diabetes. The key inquiry is whether Baskett-McEnany made an *intentional* decision to terminate DeWitt because of her diabetes. The district court properly considered the decision to terminate DeWitt and each of the arguments regarding pretext in determining that DeWitt failed to meet her burden.

Even if this Court were to use the Sixth Circuit's requirement of a particularized set of facts upon which the employer reasonably based its termination decision, SWBTC has met that burden. Baskett-McEnany explained that she decided only after fully investigating, including the Day In Court proceedings, during which DeWitt could present anything she wanted Baskett-McEnany to know. Based on her investigation, Baskett-McEnany developed her honest belief that DeWitt's misconduct was not caused by her disability and was not accidental. Baskett-McEnany's reasons are detailed in Section I.C.3 above

---

[70] SWBTC objects to DeWitt now including in her brief the results of her "simple internet search." This "evidence" and the argument are presented for the first time on appeal and should not be considered by the Court. Further, DeWitt – who has never offered evidence from a doctor supporting her case – has no foundation for this information and has not shown that this information was ever presented to the decision-makers or even existed in that form at the time of the decision.

[71] *Debord v. Mercy Health Sys. of KS, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).

Not only has SWBTC provided a set of particularized facts supporting its honest belief, but DeWitt has failed to establish that that belief was not honestly held and that the real reason was discrimination.  So, even under the Sixth Circuit's particularized facts requirement, the district court's order granting summary judgment should be affirmed.

**ISSUE II    NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES JUDGMENT AS A MATTER OF LAW ON DEWITT'S ADAAA FAILURE TO ACCOMMODATE CLAIM BECAUSE HER ONLY REQUESTED ACCOMMODATION SOUGHT RETROACTIVE LENIENCY FOR HER VIOLATION OF A WORKPLACE CONDUCT RULE**

DeWitt begins by citing to *US Airways v. Barnett*[72] as if that case requires an employer to make an accommodation for an employee even if it might violate the disability neutral rules.  *Barnett* is distinguishable because the employee was not accommodated with another position when that position went to another employee because of seniority rules.[73]  The *Barnett* Court indicated that the plaintiff should be able to make a showing why he should be given an accommodation that ordinarily would be outside the reach of the ADA, requiring the employer to violate its "established seniority system."[74]  Here, seniority rules are irrelevant.  DeWitt, while on a Last Chance Agreement, hung up on multiple customers.  Her only requested accommodation was not to be disciplined or to be granted leniency.

---

[72] 535 U.S. 391 (2002).

[73] *Id. a*t 394-95

[74] *Id.* at 399.

Aplt.App. at 197-99. Requesting to retroactively excuse misconduct is not a reasonable accommodation.[75]

The EEOC's guidance makes clear that an employer is not required to provide an accommodation that excuses a violation of a work conduct rule. Both DeWitt and the EEOC understate the seriousness of DeWitt's misconduct. While on a Last Chance Agreement, DeWitt – a *customer service* representative – hung up on *multiple customers*. Hanging up on customers violates SWBTC's Code of Business Conduct. In that Code, SWBTC prohibits disrespect for customers including hanging up on them. Even DeWitt agrees that hanging up on customers was a serious violation that could damage the company's reputation and result in termination. Aplt.App. 190-94; 214-15; 290; 295-96; 298.

The EEOC's attempt to exclude this misconduct from its own Guidance by characterizing DeWitt's behavior as performance issues and not misconduct is telling. That reading of the Guidance conflicts with its plain language and should be rejected. The Guidance explains that "[a]n employer never has to excuse a violation of a uniformly applied conduct rule that is job-related and consistent with business necessity."[76] The Guidance provides a non-exhaustive list of conduct rules which an employer never has to tolerate – violence, threats, stealing and

---

[75] *E.g., Stebbins v. Reliable Heat & Air, LLC*, 10-3305-CV-S-RED, 2011 WL 4729816 (W.D.Mo. Oct. 7, 2011) (aff'd, 473 F.App'x 518 (8th Cir 2012).

[76] Enforcement Guidance at Q&A No. 35.

destruction of property.[77]   The EEOC then references its own Guidance which defines "conduct rules" – a violation of which an employer never has to excuse even if disability-caused.  According to the EEOC Fact Sheet, the Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities (hereinafter "Fact Sheet"):

**9.    If an employee's disability causes a violation of a conduct rule, may the employer discipline the individual?**

Yes, if the conduct rule is job-related and consistent with business necessity and other employees are held to the same standard. *The ADA does not protect employees from consequences of violating conduct requirements even where the conduct is caused by the disability.*

The ADA generally gives employers wide latitude to develop and enforce conduct rules. The only requirement imposed by the ADA is that a conduct rule be job-related and consistent with business necessity when it is applied to an employee whose disability caused her to violate the rule.  Certain conduct standards that exist in all workplaces and cover all types of jobs will always meet this standard, such as prohibitions on violence, threats of violence, stealing, or destruction of property.  *Similarly, employers may ... require that employees show respect for, and deal appropriately with, clients and customers.*

**10. What should an employer do if an employee mentions a disability and/or the need for an accommodation for the first time in response to counseling or discipline for unacceptable conduct?**

If an employee states that her disability is the cause of the conduct problem or requests accommodation, *the employer may still discipline the employee for the misconduct.* If the appropriate disciplinary action

---

[77] *Id.*

is termination, the ADA would not require further discussion about the employee's disability or request for reasonable accommodation.[78]

Notably, DeWitt's violation of SWBTC's conduct rule – disrespect for customers – happened while she was on a Last Chance Agreement. This was not DeWitt's first Code of Business Conduct violation, but it was the first time that DeWitt requested a retroactive accommodation.

One cannot seriously dispute that adhering to the Last Chance Agreement and not hanging up on customers are "job-related and consistent with business necessity" and are standards to which SWBTC holds other employees. So—even under a "disability-caused misconduct" analysis—SWBTC could still, as provided for by the Guidance, discipline or terminate "for the misconduct." Last year, another court specifically applied the Guidance on this issue, finding that terminating an employee for violating job-related conduct standards [even if caused by a disability] "was a legitimate non-discriminatory reason" for discharge.[79]

DeWitt cites to the non-controlling *Walgreen* opinion regarding its accommodations analysis. That case is distinguishable regarding the failure-to-accommodate theory, which does not require proof of intent to discriminate or

---

[78] The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities (http://www.eeoc.gov/facts/performance-conduct.html#question) paragraph/questions 9 and 10 (italics emphasis added; bold in original).

[79] *Walz v. Ameriprise Fin. Inc.,* 22 F.Supp.3d 981, 987 n.4 (D.Minn. 2014).

involve *McDonnell Douglas* burden shifting.[80]   In *Walgreen*, the court found no evidence that the employee failed to meet, or that her diabetes caused her to fail to meet, Walgreen's legitimate expectations.[81]   The *Walgreen* court distinguished its facts from *Siefken v. Village of Arlington Heights*.[82] In *Siefken*, the employee failed to perform the functions of his position because he failed to control his diabetes.[83] In *Walgreen*, the court noted that there were no allegations that the employee's diabetes caused her to fail to perform the functions of her position.[84]

The *Siefken* case is more analogous to the facts here.  Although DeWitt had accommodations available to her, like the *Siefken* plaintiff, she arguably failed to control her diabetes, which prevented her from performing the functions of her position – namely providing respectful customer service by not hanging up on customers.   Consistent with *Siefken* and the EEOC's guidance, SWBTC is not required to provide accommodations for after-the-fact excuses to DeWitt's misconduct.

---

[80] *Palish v. K & K RX Servs*., L.P., 13-CV-4092, 2014 WL 2692489, at *5 n.14 (E.D.Pa. June 13, 2014)(noting that failure to accommodate and disparate treatment claims are distinct claims and are analyzed differently, with disparate treatment claims being analyzed using *McDonnell Douglas*).

[81] *Walgreen*, 34 F.Supp.3d at 1057.

[82] 65 F.3d 664 (7th Cir. 1995).

[83] *Id.* at 666-67 (cited by *Davila v. Qwest Corp., Inc.*, 113 Fed.App'x. 849, 854 (10th Cir. 2004)).

[84] *Walgreen*, 34 F.Supp.3d at 1057-59.

DeWitt also claims that the district court failed to consider *Den Hartog v. Wasatch Academy*.[85]  Although *Den Hartog* was not specifically referenced in the district court's opinion, the parties analyzed it in their respective briefing to the lower court and the summary judgment ruling is consistent with *Den Hartog*.[86] There, this Circuit indicated that while employers have no duty to accommodate misconduct stemming from alcohol or drug use, they must accommodate or tolerate a level of disability-caused misconduct in other contexts.[87] Yet, significantly, the court further noted the limits of such accommodations, stating that an employer may hold disabled employees to the same standards of conduct as non-disabled employees if (consistent with existing EEOC Guidance) "such standards are job-related and consistent with business necessity."[88]

---

[85] 129 F.3d 1076 (10th Cir. 1997).

[86] *Id.*

[87] The United States Supreme Court's ruling in *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) calls into question the viability of *Den Hartog's* ruling concerning whether non-drug/alcohol disability-caused misconduct must be tolerated or accommodated at all under the ADA. In *Raytheon*, the court stated: "To the extent that the court [of appeals] suggested that because respondent's workplace misconduct is related to his disability, petitioner's refusal to hire respondent on account of that workplace misconduct violated the ADA, we point out that we have rejected a similar argument in the context of the [ADEA]." *Id.* at 55, n.6. As SWBTC explains in this Brief, summary judgment is appropriate here under *Den Hartog* anyway, but it is questionable whether the ADAAA really requires employers to treat disability-related misconduct any differently than non-disability related misconduct.

[88] *Hartog*, 129 F.3d at 1086.

Here, SWBTC's standard of not mistreating/disconnecting customers cannot reasonably be viewed as anything but "job related and consistent with business necessity." This is not merely "eccentric or unusual" behavior, or asking an employer to look the other way when an employee was not "neat" or "courteous."[89] The fact that the conduct was not just an annoyance to co-workers but instead involved interactions with customers is significant. The examples noted in *Den Hartog* and current EEOC Guidance make that clear. The *Den Hartog* court referred to then-existing EEOC Guidance about accommodating psychiatric disabilities, noting an employer may have to make exception to general policies of requiring neatness or courtesy from an employee whose job "*did not involve interaction* with *customers* or co-workers."[90] The EEOC's Guidance on applying performance standards reiterates the significance of rules pertaining to customer interactions including, as quoted above, requiring "that employees show respect for, and deal appropriately with, clients and customers.[91]

---

[89] *Id.* at 1088-89 (referring to examples of disability-related conduct for which disabled employees should be given more leeway than non-disabled employees).

[90] *Id.* at 1088 (referring to EEOC Guidance on accommodating psychiatric disabilities and noting as a matter of accommodation employer may have to make exception to general policies of requiring neatness or courtesy from employee whose job "did not involve interaction with customers or co-workers.").

[91] EEOC, The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities

In entering summary judgment against an employee who claimed the misconduct leading to her discharge was disability-related, one federal court recently rephrased the EEOC Guidance this way:

The EEOC always considers certain conduct standards job-related and consistent with business necessity, including prohibitions on violence and insubordination, as well as requirements that "employees show respect for, and deal appropriately with, clients and customers."[92]

That conduct standards pertaining to showing respect for and dealing appropriately with "clients and customers" are inherently job-related and consistent with business necessity makes all the more sense in the context of DeWitt's job responsibilities as a customer service representative on the "front line" of customer interactions. Aplt.App. 181-82. Given the "nature of the job," the "specific conduct at issue" and the "working environment,"[93] few rules could seem *more* "job related and consistent with business necessity" than prohibiting a customer service representative from hanging up on or otherwise mistreating customers.

---

(http://www.eeoc.gov/facts/performance-conduct.html#question) paragraph/question 9.

[92] *Ameriprise*, 22 F.Supp.3d at 986-87 (citing EEOC Guidance, "Applying Performance and Conduct Standards to Employees with Disabilities" § III(B)(9)(Jan. 20, 2011), http:www.eeoc.gov/facts/performance-conduct html#conduct).

[93] EEOC Performance and Conduct Standards (http://www.eeoc.gov/facts/performance-conduct.html#question)

Tellingly, DeWitt does not discuss the significance her role as a customer service representative in the job-related/business necessity analysis. She poses "whether it is a business necessity to treat DeWitt the same as employees who intentionally hanging [sic] up on customers when DeWitt asserts that she [did so] unintentionally," but she does not meaningfully answer why it should not be. The effect is the same: the customer is likely going to be mad and it could jeopardize the company's reputation. Aplt.App. 190-92; 326-27.   She also admitted such episodes not only could recur in the future (Aplt.App. 206; 219) but also were more likely to occur in the future because she would be "less likely" to recognize the signals of a blood sugar drop and be able to get help or stop taking calls. Aplt.App. 217-18; 326-27. So, even assuming, *arguendo*, that DeWitt's conduct was caused by her diabetes, summary judgment is still appropriate because SWBTC cannot be liable for holding DeWitt to the same uniformly-applied standards as non-disabled employees.

A.     **Another Federal Court Recently Granted Summary Judgment Against an Employee Based on Alleged Disability-Caused Misconduct.**

Explicitly citing *Den Hartog* and applying the EEOC guidance discussed above, the court in *Walz v. Ameriprise Financial*, entered summary judgment against a terminated employee who sued her former employer under the ADAAA claiming that she had been unlawfully terminated based on her disability-related

misconduct.[94] The employee had been fired based on inappropriate interactions with co-workers in which she interrupted them, disrupted a meeting, and intimidated people.

Ameriprise moved for summary judgment, arguing it may terminate her employment regardless of whether such conduct was caused by her disability (i.e., it did not "disclaim reliance" on the disability and assumed for summary judgment purposes that the misconduct was caused by plaintiff's disability). The court started its analysis by quoting the general rule from *Den Hartog* that employers cannot always hold disabled employees to the same conduct standards as non-disabled employees, unless those standards are job-related and consistent with business necessity.[95]  In applying this rule, the *Ameriprise* court then restated the rule requiring that "an employer must make reasonable accommodations for a disabled employee, but need not tolerate misconduct that would result in termination of a non-disabled employee."[96]  Particularly relevant for the present case, the court noted the significance of conduct standards that relate to customer interactions, referring to the EEOC's Guidance (discussed, *supra).*[97]

Noting that a job-related/business necessity assessment can be fact-specific, the court concluded that—as a matter of law—because plaintiff's job required her

---

[94] *Ameriprise*, 22 F.Supp.3d at 986-87.
[95] *Id.*
[96] *Id.*at 986.
[97] *Id.* at 987.

to maintain good relationships with others in the company "requiring her to act appropriately and courteously toward coworkers was job-related and business necessity."[98] Consequently, terminating her based on her conduct violating this expectation was lawful and summary judgment was appropriate.[99]

Although the *Ameriprise* court assessed the job-related/consistent-with-business-necessity issue in the context of whether the plaintiff could make out a discrimination claim rather than a failure-to-accommodate claim, the same principles apply. The job expectation that DeWitt violated involved showing respect for and dealing appropriately with customers. DeWitt does not dispute that violating these conduct standards was a serious violation because of the effect on the disconnected customers.  As a matter of law, forcing SWBTC to excuse violations of its Code of Business Conduct (and disregard terms of a Last Chance Agreement) conflicts with the EEOC's clear guidelines and is unreasonable. As in *Ameriprise* and *Siefken*, DeWitt's discharge was lawful.

## ISSUE III   THE DISTRICT COURT PROPERLY GRANTED JUDGMENT AS A MATTER OF LAW ON DEWITT'S FMLA RETALIATION CLAIM

The district court correctly determined that, assuming DeWitt satisfied the *prima facie* case of retaliation, SWBTC expressed a legitimate, non-retaliatory reason for her termination.  DeWitt failed, for the reasons found in the response to

---

[98] *Id.*

[99] *Id.* 987-88.

the ADAAA claims, to raise a triable issue of pretext on her FMLA retaliation complaint. Aplt.App. at 561. As the district court properly recognized, the intervening event of the terminated calls undermines any inference that her termination was in retaliation for her FMLA usage.[100]

DeWitt, in ignorance of her Last Chance Agreement and after hanging up on two customers, argues that Kloxin's behavior and Garcia's declaration are both evidence that should be presented to a jury. As an initial matter, DeWitt improperly relies upon documents and arguments not before the district court to salvage her claim. These documents and DeWitt's arguments based on those documents are those at issue in the pending Motion to Strike and should not be considered on appeal as they were not part of the summary judgment record before the district court.[101]

Even if this Court considers DeWitt's arguments regarding Kloxin's alleged animus as a non-decision-maker, which it should not do, the district court appropriately found there was no evidence that Baskett-McEnany or Rivera shared in Kloxin's alleged motivations. Specifically, there is nothing in the record that Baskett-McEnany knew of Kloxin's behavior or that Baskett-McEnany harbored Kloxin's animus. There is no evidence that Rivera harbored Kloxin's animus. The opposite is true. The record reveals that Rivera, according to DeWitt, did not think

---

[100] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-02 (10th Cir. 2011).
[101] *Fye*, 516 F.3d at 1223 (quoting *Adler*, 144 F.3d at 671).

that DeWitt should be terminated. There is no evidence that Kloxin's statements or motive influenced Baskett-McEnany or Rivera, and the district court correctly found that her alleged animus did not taint Baskett-McEnany's termination decision.

Further, DeWitt's reliance on Suzanne Garcia's declaration, a former manager with no involvement in the termination decision, is not only improper, it creates no inference of retaliatory intent regarding DeWitt's termination. The district court correctly found that Garcia's declaration failed to create the required nexus between the alleged discriminatory statements and the decision to terminate DeWitt's employment. Aplt.App. at 552-53. Consider the following:

➢ Garcia lacked first-hand knowledge because Garcia's employment ended more than 1.5 years before DeWitt was discharged.

➢ Garcia does not name any managers present at alleged meetings discussing FMLA usage.

➢ Garcia does not provide the name of the "company executive" who made the double-hearsay comment that employees who use FMLA leave should go work elsewhere. She provides no details as to who else was there or when the meeting occurred.

➢ Garcia provides no details about the so-called "target list" of FMLA using employees, or identify anyone on the list who was, in fact, let go.

Most conspicuously absent from Garcia's declaration is the identity of any other customer service representative who was terminated because they were on the FMLA "target list." Assuming *arguendo* that SWBTC targeted employees who used leave, Garcia—or some other witness—would have provided evidence of examples of this occurring. This declaration fails to rise to the level of establishing a question of pretext because no reasonable jury could draw inferences of improper motive based on a declaration lacking personal knowledge.

The district court correctly found that Garcia's declaration fails to create a nexus between the alleged discriminatory statements and DeWitt's termination to establish that the real reason for DeWitt's termination was her FMLA usage. As such, affirming the district court's grant of summary judgment is proper.

## CONCLUSION

Accordingly, SWBT respectfully requests that this Court affirm the district court's judgment.

Respectfully Submitted,

/s/ *Adam T. Pankratz*

Michael L. Matula, #18138
Adam T. Pankratz, # 22613
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
4520 Main Street, Suite 400
Kansas City, MO  64111
(816) 471-1301
(816) 471-1303 (Facsimile)
michael.matula@ogletreedeakins.com
adam.pankratz@ogletreedeakins.com

**ATTORNEYS FOR APPELLEE**
**SOUTHWESTERN BELL TELEPHONE**
**COMPANY**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X]    this brief contains 13,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ]    this brief uses a monospaced typeface and contains <state the number of> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X ]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14, or

[ ]    this brief has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

/s/ *Adam T. Pankratz*
Adam T. Pankratz, #22613
Attorney for Appellee
4520 Main Street, Suite 400
Kansas City, MO  64111
Email: adam.pankratz@ogletreedeakins.com
(816) 471-1301

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection, Version 12.1.4112.4156, updated February 5, 2015, and according to the program are free of viruses.

/s/ *Adam T. Pankratz*
Adam T. Pankratz, #22613
Attorney for Appellee
4520 Main Street, Suite 400
Kansas City, MO  64111
Email: adam.pankratz@ogletreedeakins.com
(816) 471-1301

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2015 I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

R. Kip Elliot #17663
Disability Rights Center of Kansas
635 S.W. Harrison, Suite 100
Topeka, KS 66603
(785)273-9661
(785)273-9441 facsimile
(816) 472-6262 Facsimile
kip@drckansas.org

Amy L. Coopman
Foland, Wickens, Eisfelder
Roper & Hofer, P.C.
911 Main Street, 30th Floor
Kansas City, MO 64105
(816) 472-7474
acoopman@fwpclaw.com

**ATTORNEYS FOR PLAINTIFF**

Elizabeth E. Theran
EEOC-OGC
131 M St. NE, 5th Floor
Washington, DC 20507-0001
(202) 663-4720
elizabeth.theran@eeoc.gov

**ATTORNEY FOR U.S. EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION**

/s/     *Adam T. Pankratz*
Adam T. Pankratz, #22613
Attorney for Appellee
4520 Main Street, Suite 400
Kansas City, MO  64111
Email: adam.pankratz@ogletreedeakins.com
(816) 471-1301

20305148.1